IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MFARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>FRANCIS K. SCHMIDT, ET AL.,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>PLAINTIFFS,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Case No.   8:13-cv-03282-GJH</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>THE TOWN OF CHEVERLY, MARYLAND,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>DEFENDANT.</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

*     *     *     *     *     *     *

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Town of Cheverly, Maryland, Defendant, by its undersigned counsel, pursuant to Local Rule 105.1, submits this Memorandum in support of its Motion for Summary Judgment.

**I.      Introduction**

On August 22, 2013, Francis and Donna Schmidt (sometimes referred to collectively as "the Schmidts") filed suit, through counsel, in the Circuit Court for Prince George's County against the Town of Cheverly, Maryland ("the Town").  In their Complaint, as amended, the Schmidts set forth the following causes of action:  FMLA Reprisal (Count I); EEO Reprisal (Count II); Wrongful Discharge (Count III); Harm to Marital Unit (Count IV); and Workers' Compensation Retaliation (Count V).  All causes arise from Francis Schmidt's employment with the Town as a police officer.

Based upon the existence of federal causes of action against it, subsequent to service of process, the Town, through counsel, removed the action to the United States District Court on November 4, 2013.  The Town moved to dismiss and/or for summary judgment on November 12, 2013.  Defendant's motion was opposed and a hearing was held in open court on August 4, 2014.  On September 25, 2014, the Court issued its Memorandum Opinion and Order granting in part and

denying in part Defendant's Motion.  Specifically, the Court dismissed the Schmidt's cause of action for FMLA Reprisal and denied Defendant's Motion as to Francis Schmidt's cause of action for EEO Reprisal.  The Court granted in part and denied in part Counts III and V – Wrongful Discharge and Workers' Compensation Retaliation – by limiting the Wrongful Discharge claim only to the alleged violation of the Workers' Compensation Act and by then merging Count III into Count V.  Finally, the Court denied Defendants' Motion as to the Schmidts' loss of consortium claim and granted the motion as to the Schmidts' claim for punitive damages.

On October 3, 2014, the Town filed its Answer.  Now, upon completion of discovery, the Town moves for summary judgment as to the remaining claims in the Complaint.

## II.      Motions for Summary Judgment

Summary Judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure which provides that: "[Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).  "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F. 3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)).  The court should "view the

2

evidence in the light most favorable to .... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F. 3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F. 3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F. 2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc*., 840 F. 2d 236, 240 (4th Cir. 1988).

Applying these principles here establishes that the Town is entitled to summary judgment.

### III.     The Material Facts Not Genuinely In Dispute

#### A.     The Leave Issues

##### 1.     Francis Schmidt's Injury and Requests for Administrative Leave

Francis Schmidt suffered a ruptured hernia while on duty on September 29, 2011.  (Exhibit 2).  The injury had to be surgically repaired.  (Exhibit 2).  At the time of his injury, Francis Schmidt did not have sufficient sick/vacation/comp leave for the period of time he would need to miss work to recuperate from surgery.  (Exhibit 2).

On October 9, 2011, Francis Schmidt sent a letter to David Warrington, Town Administrator for the Town ("Mr. Warrington"), requesting a "30 day leave extension."  (Exhibit 2).  On October 11, 2011, Francis Schmidt wrote to Mr. Warrington again and this time requested "15 day [sic] admin leave extension to recover from a work related injury."  (Exhibit 3).  On October 12, 2011,

Mr. Warrington wrote to Francis Schmidt and informed him that he had been granted thirty (30) days of administrative leave, from October 11 through November 11.  (Exhibit 4).

On November 2, 2011, Francis Schmidt faxed a Disability Certificate from Surgical Associates of Fredericksburg to Mr. Warrington.  In response, Mr. Warrington extended Mr. Schmidt's administrative leave for an additional thirty days, to December 11, 2011.  (Exhibit 5).

## 2.    Corporal Gizinski's Inquiry as to Leave Banks

In either October or no later than November 4, 2011, Corporal Edmund Gizinski of the Cheverly Police Department ("Corporal Gizinski") met with Chief Robshaw to discuss the Town's leave policy.[1]  During the meeting, Corporal Gizinski asked if the Town had a policy dealing with leave donation.  (Exhibit 7, pp. 10, lines 17 through 20).  Chief Robshaw said it did not.  He then went on to remind Corporal Gizinski, who like Chief Robshaw had once worked for the Prince George's County Police Department, that Prince George's County had a leave donation policy, but that the Town did not.  (Exhibit 7, p. 10, line 22 through p. 11, line 3).

Corporal Gizinski then met with Mr. Warrington to discuss the issue.  (Exhibit 8, p. 34, line 17 through p. 35, line 11).  He asked Mr. Warrington whether the Town had a leave sharing policy. (Exhibit 8, p. 35, line 15 through p. 36 line 2).  After confirming that Corporal Gizinski had previously discussed the issue with Chief Robshaw, Mr. Warrington advised Corporal Gizinski that the Town does not have a leave donation policy.  (Exhibit 8, p. 35, line 15 through p. 36, line 2).

---

[1] In his first Charge of Discrimination, Francis Schmidt claimed that Corporal Gizinski met with Chief Robshaw in October 2011.  (Exhibit 6).  He contradicted himself in his Answers to Interrogatories, claiming that Corporal Gizinski met with Chief Robshaw on or about November 4, 2011 "to organize a leave bank."  (Exhibit 1, Answer to Interrogatory No. 5).  Chief Robshaw testified that the meeting took place in early October 2011.  (Exhibit 7, p. 10, lines 8 through 15).

3.      **Francis Schmidt's Request for FMLA Leave**

On November 9, 2011, Francis Schmidt sent a memo to Mr. Warrington concerning his leave status.  (Exhibit 9).  With the expiration of his administrative leave without pay approaching, Francis Schmidt stated that he was now acting "on advice of counsel," and asserted his "right to invoke FMLA pursuant to USC Title 29 Chapter 28 Subchapter 1 Section 2612 as of today."  (Exhibit 9).  Schmidt, again, acting on advice of counsel, did not state that he had a qualifying "disability" under the Americans With Disabilities Act ("the ADA") and did not seek reasonable accommodation for any such "disability."  (Exhibit 9).  As is discussed below, Francis Schmidt had no disability recognized under the ADA.  He had a hernia that need to be surgically repaired.

B.      **The Charges of Discrimination**

1.      **The Charge of Discrimination Filed by Donna Schmidt**

On November 15, 2011, Donna Schmidt, the spouse of Francis Schmidt, filed a Charge of Discrimination with the Prince George's County Human Relations Commission ("HRC") (HRC Case No. SG11-1109).  (Exhibit 10).  Although not an employee of the Town or its Police Department, nor a resident of Prince George's County, Donna Schmidt alleged that, in December 2009, Chief Robshaw "sexually harassed" her and made "derogatory and degrading comments to her" at a Christmas party in 2009.  (Exhibit 10). [2]  Donna Schmidt further alleged that Chief Robshaw made inappropriate comments and touched her inappropriately at an event in September 2010.  The Charge of Discrimination was not filed or cross-filed with either the EEOC or the State's Civil Rights Commission and was assigned only a Fair Employment Practices Agency

---

[2] In their depositions, Donna and Francis Schmidt acknowledged that the Christmas party was actually in 2008, not 2009.  (Exhibit 11, p. 13 line 6 through p. 14, line 13; Exhibit 12, p. 73, lines 10 through 21).

("FEPA") case number.  The Charge of Discrimination alleged discrimination in violation solely of

"**Prince George's County Code Division 12**." (Emphasis in original)  (Exhibit 10).

At the time of Donna Schmidt's filing in November 2011, Subtitle 2, Division 12, § 2-185(b)

of the Prince George's County Code ("the Code") required the County government to direct its

efforts and resources toward "eliminating discriminatory practices within the County in the areas of

housing, employment, law enforcement, education, public accommodations, commercial real estate,

and any other facets of the lives *of its citizens* where such practices may be found to exist."[3]

(Emphasis added).  The Code defined "discrimination" as:

> acting, or failing to act, or unduly delaying any action regarding any
> person because of race, religion, color, sex, national origin, age (except as
> required by State or federal law), occupation, familial status, marital
> status, political opinion, personal appearance, sexual orientation, or
> physical or mental handicap, in such way that such person is adversely
> affected in the areas of housing and residential real estate, employment,
> law enforcement, education, financial lending, public accommodations, or
> commercial real estate.

*Id.*, § 2-186(a)(3).  Of course, none of these "protections" was even remotely the subject of Donna

Schmidt's Charge of Discrimination.  In fact, as a non-resident of Prince George's County (Exhibit

2, p 64, lines 14 through 16; Exhibit 10), Donna Schmidt was not entitled to invoke any of the

protections of Division 12.  In addition, the event she chose to vindicate was her supposed offense

taken by her at a Christmas party three years before at which she was a guest/attendee.  Seemingly

aware that timeliness could be an issue with her Charge, Donna Schmidt falsely swore in her Charge

that the triggering event occurred in December 2009.  It did not.  The Christmas party she attended

was in 2008.  In an Affidavit submitted to this Court dated November 26, 2013, Donna Schmidt

---

[3] The pertinent provisions of the Prince George's County Code, Subtitle 2 (Administration),
Division 12 (Human Relations Commission), can be accessed at on-line at the following location:
lis.princegeorgescountymd.gov/default.asp?File=&Type=TOC41

corrected her "mis-recollection."  (Exhibit 13).  In the Affidavit, Donna Schmidt affirmed that the event occurred in December 2008.  (Exhibit 13, ¶ 2).  It was at this "party," that, according to Donna Schmidt, the Town's Chief of Police made "derogatory and degrading comments to [her] about women and women he used to date" and "touched [her] inappropriately" with a pool cue.  (Exhibit 13, ¶ 2).  In her Charge, Donna Schmidt complained of similar misdeeds by the Chief of Police at another "event" at which she was a guest/attendee" in September 2010.  (Exhibit 10).

From its face, the Charge of Discrimination established not only Donna Schmidt's non-residency and non-employment in Prince George's County, [4] but also that she took no action concerning Chief Robshaw's supposed conduct until approximately three years after the first incident and more than one year after the second.  The reason for this inordinate delay is patently clear:  Donna Schmidt did not file a Charge of Discrimination to vindicate any protections afforded her by the County Code.  To the contrary, she admittedly acted for one and only one reason:  to protect her husband's employment.  In her Charge of Discrimination, Donna Schmidt gratuitously alleged that the Police Chief had "threatened to terminate [her] husband's employment as recent as November 2011, if a complaint was made against him."  In the same Charge filed in November 2011, Donna Schmidt made no reference of "threats" made by Chief Robshaw pertaining to her husband's then extant worker's compensation claim and/or his claim for leave under the FMLA.

Beyond her Charge of Discrimination, Donna Schmidt offered a different, expanded, but similarly affirmed version relating to her Charge in the Affidavit discussed above. In it, Donna Schmidt swore that her husband had sustained a work-related hernia in late September 2011, and that she reported the injury and subsequent surgery to the Town Police Department and "requested

---

[4] During her deposition, Donna Schmidt admitted that she never resided or worked in Prince George's County.  (Exhibit 11, p. 64, lines 14 through 19).

documents for worker's compensation."  (Exhibit 13, ¶ 6).  She further swore that she learned through the police department's "Fraternal Order of Police representative" on or about October 5, 2011, that Chief Robshaw had told him "that Frank (Francis Schmidt) was going to be fired for taking worker's compensation leave."  (Exhibit 13, ¶ 11).  Thus, Donna Schmidt had admittedly possessed this information for six weeks *before* her Charge of Discrimination was filed, yet it was never mentioned.  But, according to Donna Schmidt, based on this information, she "began a campaign to save [her] husband's job and prevent his termination."  (Exhibit 13, ¶ 13).  This "campaign" included filing a Charge of Discrimination, not with the EEOC as she swore in her Affidavit, but solely with a FEPA, proceeding not under Title VII, but solely under local law. Again, the reasons are apparent:  as a non-employee, Donna Schmidt had no rights to protect under Title VII or State law.  As a non-resident, she had no "rights" to protect under the County Code.  Yet that did not prevent her from filing a sham Charge of Discrimination as part of a "campaign" to protect her husband's employment.  And, although the Town had no advance knowledge of her intended Charge of Discrimination, Donna Schmidt, in her Affidavit, could only offer her "belief" that it did.  As a final parody, Donna Schmidt "alleged" in her Charge "that Chief Robshaw had threatened to fire my husband if [she] reported the Chief's gross misconduct during the December 2008 (not 2009) Christmas party."  (Exhibit 10).

The HRC proceeded to investigate Donna Schmidt's Charge of Discrimination, and, on April 24, 2012, issued a Determination against her.  (Exhibit 14).  Regarding the alleged incident at the Christmas party, the HRC determined that it had occurred more than 180 days prior to her filing the charge and was therefore barred by the statute of limitations.  (Exhibit 14).  As to the event in September 2010, the HRC determined that it occurred outside of Prince George's County and therefore it lacked geographical jurisdiction to investigate that complaint.  (Exhibit 14).

**2.      The First Charge of Discrimination Filed by Francis Schmidt**

Two and half weeks later, on November 29, 2011, Francis Schmidt filed a Charge of Discrimination with the EEOC/HRC (EEOC No. 12H 2012 00038) (FEPA HRC11-1113).  (Exhibit 6).  In support of his charge, Francis Schmidt checked the boxes for discrimination based on "Retaliation" and "Disability."  (Exhibit 6).  Specifically, he alleged that he had been discriminated against on the basis of disability and that he had been retaliated against because of his "participation in a discrimination complaint," namely, the Charge of Discrimination filed by his wife.  (Exhibit 6).  Francis Schmidt did not describe the nature of his alleged participation.

On February 1, 2012, the Town responded directly to the merits, establishing the chronology of events related to Francis Schmidt's charge of discrimination.  (Exhibit 15).  That chronology detailed the internal investigation of Francis Schmidt that led to the issuance of multiple sustained charges against him.  (Exhibit 15; Exhibit 16; Exhibit 17).  It also established that, as a result of the charges, Francis Schmidt was suspended on an emergency basis pending hearing of the charges against him pursuant to the Law Enforcement Officers' Bill of Rights ("LEOBR") (Exhibit 18).

Francis Schmidt's first Charge of Discrimination matter was investigated, and, on September 21, 2012, the HRC issued its Determination against Francis Schmidt, finding that his charges were "without merit."  (Exhibit 19).  As to the workers' compensation aspect of his allegations, the HRC found that "all decisions regarding whether workers' compensation is awarded [are] made by the [Injured Workers' Compensation Fund]," not the Town.  (Exhibit 19, p. 4).  Further, the HRC found that Francis Schmidt's purported "medical condition" (a hernia) was "not a substantially limiting impairment."  (Exhibit 19, p. 4).  The HRC Investigator's Determination was upheld by the HRC on December 17, 2012, and Francis Schmidt's Charge of Discrimination was dismissed.  (Exhibit 20).

The EEOC adopted the findings of the HRC on May 15, 2013, and issued its Notice of Suit Rights. (Exhibit 21).

### 3.    The Second Charge of Discrimination Filed by Francis Schmidt

Subsequent to his termination in August 2012, Francis Schmidt filed a second Charge of Discrimination on October 2, 2012.  (Exhibit 22).  This one, filed with the EEOC (Charge No. 12H 2013-00002), was assigned for investigation to the HRC (Charge No. 12-1002).  (Exhibit 22).  In this second charge, Francis Schmidt alleged only "retaliation" resulting from his having previously filed a Charge of Discrimination.  (Exhibit 22).  Specifically, Francis Schmidt alleged that he believed the Town "retaliated against [him] in the terms, conditions, privileges, and involuntary discharge of [his] employment because [he] filed a Charge of Discrimination against the Respondent."  (Exhibit 22).  In this Charge, Francis Schmidt designated the earliest act of discrimination as November 29, 2011, and the last as August 13, 2012.  (Exhibit 22).  Both dates referred to discrete acts:  the date Francis Schmidt filed his first Charge of Discrimination (November 29, 2011) and the date of his termination (August 13, 2012).  (Exhibit 22).

On November 21, 2012, the Town responded to the HRC.  (Exhibit 23).  In its response, the Town, through counsel, set forth the chronology discussed above and added that Francis Schmidt's administrative hearing ("the Hearing Board") under the LEOBR was held between July 16 and 18, 2012.  (Exhibit 23, p. 3; Exhibit 24, p. 1).  The Hearing Board's most significant finding was that, based upon the evidence, Francis Schmidt, during the course of the investigation, had made a false statement to the investigating officer (Charges 14 through 18).  (Exhibit 23, p. 3; Exhibit 24, pp. 4 through 6 and 16 through 18).  The Hearing Board recommended a penalty of a $1,000.00 fine, a loss of forty (40) hours of annual leave, and suspension from the Police Department's take-home-car program.  (Exhibit 24, pp. 19-20).  However, primarily due to the response from the Office of the

State's Attorney for Prince George's County concerning the impact of the LEOBR adjudication on Francis Schmidt, Chief Robshaw ultimately enhanced the recommended punishment and terminated Francis Schmidt's employment.  (Exhibit 23, p. 3; Exhibit 25, p. 5, Exhibit 26).  Under the LEOBR such authority is reserved solely to a chief of police.[5]  (Exhibit 27, ¶ 3).

While his second Charge of Discrimination was being investigated. Francis Schmidt requested a "Right to Sue" letter directly from the EEOC.  (Exhibit 28).  As a result, the HRC advised Francis Schmidt by letter dated August 6, 2013, that it would discontinue its investigation and close its investigation.  (Exhibit 28).

### C.      The Pertinent LEOBR Proceedings

#### 1.      The First LEOBR Proceeding – 2011 through 2012

##### a.      Investigation and Charges

On December 5, 2011, Francis Schmidt was informed, in writing that the Town was conducting an investigation into the circumstances surrounding several thousand dollars in unreported damage to the police car assigned to him for patrol and as part of the Town's take-home-car policy.  (Exhibit 29).  Lieutenant Mark Roski of the City of Hyattsville Police Department ("Lieutenant Roski") was appointed as the investigating officer.  (Exhibit 16). During the course of the investigation, Lieutenant Roski interviewed Francis Schmidt, with his counsel present, and asked Francis Schmidt in several different ways how the vehicle came to be damaged.  (Exhibit 30). Francis Schmidt, essentially denied knowing.  (Exhibit 30).

---

[5] Francis Schmidt appealed the administrative outcome to the Circuit Court for Prince George's County (*In Re* Francis Schmidt, Case No. CAL12-29212).  On October 9, 2013, that Court ordered that the decision of the Hearing Board be reversed on grounds that the hearing panel improperly included the chief of police of another agency.  The matter was remanded and a second hearing board was convened.  *See* Section III. C. 1.d.

On April 23, 2012, Francis Schmidt was charged with twenty-six different violations of the Cheverly Police Department's General Orders and the Town Code. (Exhibit 17). The gist of the charges was that he knew or should have known that his vehicle was damaged, failed to report it, and lied about it during the investigation. (Exhibit 17). That same day his police powers were suspended. (Exhibit 18). He was suspended under the Town's General Orders that allows for the suspension of employees for "Knowingly giving false statements to supervisors or the public" and Immoral or unethical conduct reflecting unfavorably on the Town as an employer." (Exhibit 18).

### b.      The Hearing Board

The Hearing Board was convened on July 16, 2012 and concluded two days later, on July 18, 2012. (Exhibit 24). Francis Schmidt was found guilty on eight of twenty-six charges.  (Exhibit 24, pp. 13-19). He was found guilty with respect to charges 1, 11, 14, 15, 17, 18, 20 and 21. (Exhibit 24, p. 13-19). By finding Francis Schmidt guilty with respect to charges 1 and 11, the Hearing Board determined that he knew or should have known about the damage to the vehicle. (Exhibit 24, p. 13 & 15). By finding Francis Schmidt guilty with respect to charges 14, 15, 17, 18, 20 and 21, it found that he lied about the damage. (Exhibit 24, pp. 16 through 18). The Hearing Board recommended that Francis Schmidt be fined $1,000 and be suspended forty hours without pay. (Exhibit 24, p. 20). The Board further recommend that Francis Schmidt be suspended from the take-home-car program for one year. (Exhibit 24, p. 20).

### c.      Chief Robshaw's Imposition of Discipline

Prior to imposing discipline, Chief Robshaw reviewed the Hearing Board's written findings, as well as the evidence presented to the Hearing Board, a transcript of the proceedings before the Hearing Board, and Francis Schmidt's entire personnel file. (Exhibit 25; Exhibit 27, ¶ 4). The Chief also took into consideration comments made by Francis Schmidt during a meeting involving

Chief Robshaw, Francis Schmidt, his attorney, and PFC Pam Kruger, on August 24, 2012.  (Exhibit 25; Exhibit 27, ¶ 7).  After speaking with him, Chief Robshaw verbally advised Francis Schmidt that he was terminated.  (Exhibit 25; Exhibit 27, ¶ 7).  On August 28, 2012, Chief Robshaw issued a detailed memorandum to Francis Schmidt detailing the reasons why his employment was terminated.  (Exhibit 25; Exhibit 27, ¶ 8).

### d.      The Administrative Appeal and Remand

Subsequent to his termination, Francis Schmidt noted an administrative appeal to the Circuit Court for Prince George's County, Civil Action Number:  CAL12-29212.  (Exhibit 31).  One of the issues raised on appeal, and the only one actually addressed by the Court in its Memorandum Opinion, was whether the composition of the Hearing Board was improper.   (Exhibit 31, pp. 2 & 4). Francis Schmidt argued that LEBOR specifically prohibits the inclusion of a chief of police on a hearing board.  (Exhibit 31, pp. 5 through 12).  He argued that because his Hearing Board included a chief of police, it was improperly constituted and that he was entitled to a new hearing.  (Exhibit 31 pp. 4 through 12).  After hearing oral argument on the issues, Judge Alves held that the "composition of the Hearing Board violated [Francis Schmidt's] rights" under the LEOBR.  (Exhibit 31, p. 1). Consequently, she remanded the matter with instructions that a new hearing board be convened. (Exhibit 31, p. 12).

### 2.      The Second LEBOR Hearing – February 2014

### a.      The Hearing Board

A second Hearing Board was convened on February 17, 2014.  (Exhibit 32).  After more than two days of testimony and evidence, the Hearing Board found Francis Schmidt guilty of having been in an accident between July 28, 2011 and August 15, 2011, and failing to report it under the General Orders, as well as of willful or repeated negligence having been in an accident between

July 28, 2011 and August 15, 2011, and failing to report it.  (Exhibit 32).  It found him not guilty of all charges related to making false statements in the course of the investigation.  (Exhibit 32).  The Hearing Board recommended that Francis Schmidt be fined $3,281.00, that he be removed from the Town's take-home-car program for one year, and he be reduced in rank for six months.  (Exhibit 32).

### b.      Chief Robshaw's Imposition of Discipline

On March 20, 2014, Chief Robshaw issued his Final Disciplinary Action in a Memorandum to Francis Schmidt.  (Exhibit 33).  Chief Robshaw accepted the recommended punishment of $3,281.00 and suspension from the take-home-car program for one year.  (Exhibit 33).  He rejected the Hearing Board's recommendation that Francis Schmidt be reduced in rank for six months as not being in the best interests of the Department.  (Exhibit 33).  In light of the Hearing Board's decision, Chief Robshaw elected not to exercise his discretion to enhance the recommended punishment.  He chose not to do so "because [Francis Schmidt] was not found guilty of making a false statement."  (Exhibit 7, Robshaw depo, p. 192, lines 1 through 10).

### IV.    Argument

### A.      The Failure of the EEO Reprisal Claim

At oral argument on August 4, 2014, the Court focused on the pivotal question, the answer to which ultimately undermines Francis Schmidt's claim of retaliation under Title VII.  That question, simple and direct, is paraphrased thus:  "What protected characteristic under Title VII is at issue?"  Counsel had no answer then and there can be no valid answer now.   In this regard, Title VII's prohibition against retaliation protects only those whose efforts "secure or advance" the statute's basic guarantees; it affords no protection to those who allegedly act to "secure or advance" guarantees, questionable or otherwise, found in other sources, such as State or local law.  That is

exactly the circumstance here.  As such, when Count II is subjected to the undisputed facts, facts attested to by the Schmidts themselves, it fails as a matter of law.

Title VII forbids employment discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a), and its anti-retaliation provision serves to "prevent [ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006); *DeMasters v. Carillon Clinic*, 796 F. 3d 409, 416 (4ᵗʰ Cir. 2015); 42 U.S.C. § 2000e–3(a).  As to retaliation specifically, Title VII makes it unlawful to retaliate against anyone who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  In order to establish a *prima facie* Title VII retaliation claim, a plaintiff must demonstrate three elements: "(1) that [he] engaged in a protected activity, as well as (2) that [his] employer took an adverse employment action against [him], and (3) that there was a causal link between the two events." *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (*en banc*) (internal quotation marks omitted).  Title VII's Opposition Clause, by its terms, prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e–3(a).

The Supreme Court has defined "oppose" in this context by looking to its ordinary meaning: "to resist or antagonize ...; to contend against; to confront; resist; withstand; ... to be hostile or adverse to, as in opinion." *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 276 (2009) (internal citations omitted) (quoting Webster's New International Dictionary 1710 (2d ed.1958); Random House Dictionary of the English Language 1359 (2d ed.1987)).  The Fourth Circuit, as well as the other Courts of Appeals, also has articulated an expansive view of what

15

constitutes oppositional conduct, recognizing that it "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth*., 149 F.3d 253, 259 (4th Cir. 1998); *see also Collazo v. Bristol–Myers Squibb Mfg., Inc*., 617 F.3d 39, 47–48 (1st Cir. 2010) (recognizing that even non-verbal conduct may constitute protected activity); *Barrett v. Whirlpool Corp*., 556 F.3d 502, 516 (6th Cir. 2009) (protected activity includes "complain[ing] about unlawful practices to a manager, the union, or other employees"); *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d  Cir.2006) (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc*., 450 F.3d 130, 135 (3d Cir. 2006)) (protected activity covers "informal protests of discriminatory employment practices[,] including making complaints to management"); *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996) (protected activity includes endeavoring to obtain an employer's compliance with Title VII).  In short, the oppositional activity must be directed to "an unlawful employment practice" under Title VII, 42 U.S.C. § 2000e–3(a).[6]

And the necessary oppositional activity is precisely what is lacking here.  At no time did Donna Schmidt act under Title VII to secure or advance any guaranty against employment discrimination that she possessed.  And her husband did not assist her in advancing or securing any such guaranty.  As one who was never employed by the Town (Exhibit 11, p. 64, lines 17 through 19), Donna Schmidt had no legal basis to seek relief under Title VII and, knowing that, she did not do so.  Instead, she acted exclusively under the auspices of local law by filing a Charge of

---

[6] The Fourth Circuit's recent *en banc* opinion in *Boyer–Liberto* made clear that "unlawful employment practice" is to be interpreted broadly.  786 F.3d at 282. Thus, "an employee is protected when she opposes 'not only ... employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful,' " and the Title VII violation to which the oppositional communication is directed "may be complete, or it may be in progress." *Id*. (alterations in original) (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)).

Discrimination with the HRC, an FEPA, alleging "sex" discrimination in violation not of Title VII, but of "Prince George's Code Division 12 (Human Relations Commission)."  Her Charge of Discrimination was neither co- nor cross-filed with either the EEOC or the State's Civil Rights Commission; it was filed solely with the PGCHRC and was solely assigned that agency's Charge number.

Subsequent to his wife's filing, Francis Schmidt followed with his own Charge of Discrimination two weeks later.  (Exhibit 6).  Yet, unlike his wife, Francis Schmidt on November 29, 2011, he filed his charge with both a FEPA (the HRC) and the EEOC.  (Exhibit 6).  He alleged both disability discrimination under the ADA and retaliation under Title VII.[7]  (Exhibit 6).  The "retaliation," according to Francis Schmidt's sworn Charge, was the denial of leave donations "because of [his] participation in a discrimination complaint."  (Exhibit 6).  Therein lies the problem. Francis Schmidt's purported "participation" was with a charge focused not on anything protected against under Title VII, but rather on offense taken at statements made and certain actions at social events, including a Christmas party.  In other words, Francis Schmidt did not participate in any effort to advance or secure any guaranty against employment discrimination found in Title VII.  In the absence of that, Francis Schmidt's claim of "retaliation" under Title VII rings, at best, hollow, and, at worst, patently false.

Although Donna Schmidt may have taken offense at Chief Robshaw's purported statements and actions, and pursued a Charge of Discrimination long after the fact, her Charge was based on personal offense, not discrimination in employment.  Thus, none of them had refuge in Title VII.

---

[7] As is pointed out and discussed *infra*, the Complaint, as amended, never included a cause of action for discrimination in violation of the ADA or retaliation in violation of the Act.

17

In light of these undisputed facts (and the Charges of Discrimination do speak for themselves), it is hard to discern whose abuse, Donna or Francis Schmidt's, is more egregious.  But no such determination needs to be made.  One thing, however, is crystal clear:  Francis Schmidt was as just as willing as his wife to commit perjury if it fitted his needs to do so.  In his first Charge of Discrimination, Francis Schmidt swore to a single act of retaliation, the denial of leave donations in October 2011.  (Exhibit 6).  Again, according to Francis Schmidt's sworn Charge, this "retaliation" by the "Lieutenant and Chief of Police" was the direct result of his "participation in [his] wife's sexual harassment complaints against my boss."  (Exhibit 6).  However, there is a slight problem with this sworn version.  Donna Schmidt's Charge of Discrimination was not filed until November 15, 2011; weeks after Corporal Gizinski's inquiry into the Town's leave policies.  And, there is no evidence, none, Donna Schmidt's "belief" aside, that the Town had any fore-knowledge that a charge would be filed.

Moreover, Francis Schmidt was not denied "leave donations" in October 2011.  To the contrary, knowing what the Town did and did not allow, Francis Schmidt only requested the granting of "administrative leave."  (Exhibit 2; Exhibit 3).  He made this request because he had exhausted all of his vacation/sick/comp time.  (Exhibit 2; Exhibit 3).  Further, nothing in the record establishes that Francis Schmidt ever personally requested "leave donations."  Instead, it was Corporal Gizinski who raised the issue of leave donations.  He asked Chief Robshaw and Mr. Warrington whether the Town had a leave donation policy.  He was told in response that although Prince George's County had such a policy, the Town did not.  (Exhibit 7, p. 10, line 22 through p. 11, line 3; Exhibit 8, p. 35, line 15 through p. 36, line 2).  Consequently, it is disingenuous, at best, to use this imparting of Town policy to another officer as a basis upon which to claim retaliation.

Francis Schmidt was denied nothing in this regard.  No Town employee, including Francis Schmidt, was entitled to request leave donations and he made no such request here.

In sum, it has been established, and proven, that at no time did Francis Schmidt engage in "protected opposition activity" under Title VII of the Civil Rights Act of 1964.  At no time did his actions encompass communication to his employer of his belief that his employer had engaged in a form of employment discrimination.  Further, at no time did his actions, whatever they might have been, in relation to Donna Schmidt's Charge, concern conduct that was "actually unlawful under Title VII" or that he could reasonably have believed to have been so.  *See Boyer–Liberto*, 786 F.3d at 282.  As such, summary judgment must and should be granted as to Count II.[8]

### B.     The Absence of Any ADA Discrimination or Retaliation Claim

These "claims" can be disposed of quickly for one obvious reason:  There are no such claim pled in the Complaint, as amended.  The Complaint, as amended, has never, and does not now, include either a discrimination or reprisal claim under the ADA.  The "reprisal claims" specifically pled were FMLA Reprisal (the now dismissed Count I) and EEO Reprisal (Count II), limited to Francis Schmidt's alleged "participation" in his wife's sexual harassment charge.  In fact, the Complaint, as amended, is devoid of any reference to the Americans With Disabilities Act or its acronym ("ADA").  Further, when identifying the statutes upon which its claims are based, the Complaint, as amended, identifies only "The Maryland Human Rights Act," "The Prince George's

---

[8] Even presuming the existence of "protected activity" and "adverse action," *i.e.*, termination, for the purposes of this Motion, there is no evidence of the stringent "but-for" causation required under Title VII.  To the contrary, the record, again, including the Affidavit of Chief Robshaw, establishes that the employment actions taken against Francis Schmidt, including his emergency suspension with pay effective the date he was served with the administrative charges, were related solely to the internal investigation, and no other conduct concerning or related to Donna Schmidt's Charge of Discrimination, Francis Schmidt's Charge of Discrimination, or any other matter.  Absent any evidence of such "but-for" causation, this claim fails on the merits.

County Human Rights Ordinance," "The Family and Medical Leave Act,"[9] and "The Maryland Workers' Compensation Law." (ECF No. 4, ¶ 5 & 106). Again, no mention of the ADA is made. Such claim is discussed here only in light of Francis Schmidt's reference to "disability" in his first Charge of Discrimination and his reference to "retaliation" in his second. The reasons for the Schmidt's failure to proceed under the ADA, either directly or indirectly, are discussed below.

The reason an ADA discrimination claim is absent is readily apparent: The so-called "disability" mentioned in Francis Schmidt's first Charge of Discrimination was a hernia repair surgery and recuperation. (Exhibit 1, Answer to Interrogatory No. 5). Hernias, however, do not rise to the level of ADA protection, and, thus, are not "disabilities" under the law. Federal courts across the Country have repeatedly held relative to hernia repair that, because it is temporary, can be corrected by surgery, and does not substantially limit major life activities, is not a recognized "disability" under the ADA. *See, e.g., Brodzik v. Contractors Steel, Inc*., 48 F. Supp. 3d 1183, 1198-99 (N.D. Ind. 2014); *Thompson v. St. Johns Unif. Sch. Dist*., 26 F. App'x 712, 717 (9th Cir. 2002); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *Williams v. Fred Meyer Stores Inc*., No. C07–5013 RBL, 2008 WL 65507, at *2 (W.D. Wash. Jan. 4, 2008); *Lundberg v. Burlington N. & Santa Fe Ry. Co.,* No. Civ. 01–2286 (DWF/JSM), 2003 WL 21402605, at *5 (D. Minn. June 17, 2003); *Johnson v. City & County of San Francisco*, Nos. C–99–4375 JL, C–00–0221 JL, 2001 WL 263298, at *5 (N.D.Cal. Mar. 8, 2001); *Green v. Rosemont Indus., Inc.,* 5 F.Supp.2d 568, 572–73 (S.D. Ohio 1998); *Gonzalez v. Perfect Carton Corp.,* No. 95 C 5476, 1996 WL 89058, at *2 (N.D. Ill. Feb. 28, 1996). *But see Markham v. Salina Concrete Prod. Inc.*, No. 10–1104–JTM, 2010 WL 5093769, at *3 (D. Kan. Dec. 8, 2010). As such, there is no evidence in this record that Francis Schmidt was

---

[9] The Complaint originally include a separate "FMLA Reprisal" claim. That claim was preliminarily dismissed as being insufficiently pled.

actually disabled or that his employer ever perceived him as having or believed that he had anything in the way of a "disability" worthy of protection under the ADA.  In light of such precedent, the absence of an ADA discrimination claim is apparent.

As to any ADA retaliation claim, a *prima facie* case is dependent upon proof that the plaintiff (1) engaged in protected conduct, (2) that he or she suffered an adverse action, and (3) that a causal link exists between the protected conduct and the adverse action. *See Rhoads v. FDIC,* 257 F.3d 373, 392 (4th Cir. 2001).  "[P]rotected activity" is defined by ADA as constituting conduct that falls into one of two categories: (a) the plaintiff "has opposed any act or practice made unlawful by this chapter"; and (b) the plaintiff "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "With respect to [this] first element of a retaliation claim, ... plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (citation omitted).

Regarding the third element, a recent change in the law announced by the Supreme Court of the United States in *University of Tex. Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), holds that a plaintiff making a retaliation claim under Title VII must establish that his or her protected activity was "a but-for cause" of the alleged adverse action by the employer." *Nassar,* 133 S. Ct. at 2533.  The same standard has been adopted for cases arising under the ADA.  *See Staley v. Gruenberg,* 575 Fed. Appx. 153, 155 (4th Cir. 2014) (citing *Nassar,* 133 S. Ct. at 2533); *see also Feist v. La., Dep't of Justice, Office of the Atty. Gen.,* 730 F.3d 450, 454 (5th Cir. 2013); *Gallagher v. San Diego Unified Port Dist.,* 14 F. Supp. 3d 1380, 1386-87 (S.D. Cal. 2014) (This Court is unpersuaded by Plaintiff's arguments and agrees with the District that ADA retaliation claims must

also be analyzed under traditional but-for causation); *Brooks v. Capistrano Unified Sch. Dist.,* 1 F.Supp.3d 1029, 1037, 2014 WL 794581, at *6 (C.D. Cal. Feb. 20, 2014) ("This Court sees no principled reason why Title VII retaliation claims are subject to the but-for causation standard while the lesser 'motivating factor' causation would apply to retaliation claims brought under other statutes."); *Doan v. San Ramon Valley Sch. Dist.*, 2014 WL 296861, at *3 (N.D. Cal. Jan. 27, 2014) (requiring a but-for causal link between the protected activity and the adverse employment action because "ADA retaliation claims are subject to the same framework of analysis as that of Title VII."); *Equal Employment Opportunity Comm'n v. Evergreen Alliance Golf Ltd*., 2013 WL 4478870, at *11 (D. Ariz. Aug. 21, 2013); *Nordike v. Verizon Bus., Inc.,* 2014 WL 4749185 n 54 (D. Kan. 2014) (unpublished) (collecting cases from Courts in which the but-for standard adopted in *Nassar* has been applied to cases alleging retaliation under the ADA).

In the instant case, the Town concedes none of the elements.  First, at the time of his surgery hernia and recuperation, Francis Schmidt was represented by counsel.  (Exhibit 9).  Thus, even his reference to "disability" in his first Charge of Discrimination filed on November 29, 2011, is patently false.  Sustaining a simple hernia, and acting through counsel, Francis Schmidt could not have, and did not, possess a "good faith, reasonable belief" that the Town was, in any way, acting in violation of the ADA.  Thus, when suit was filed, it included in Count I a separate claim for FMLA Reprisal, not ADA Reprisal.

Even presuming the existence of "protected activity" and "adverse action," *i.e.*, termination, for the purposes of this Motion, the summary judgment record belies even the suggestion of "but for" causation.  First, Francis Schmidt's first Charge of Discrimination was not limited to a claim under the ADA.  Instead, it was largely based on alleged acts of retaliation taken against him not because of any disability, but rather because he "participated" in his wife's discrimination complaint.

Thus, and for that reason alone, the "retaliation" asserted by Francis Schmidt in his second Charge of Discrimination was not limited to his claim of "disability" discrimination in the first.

Even more fundamentally, the absence of temporal proximity between the allegedly retaliatory termination and Francis Schmidt's first Charge of Discrimination negates an ADA retaliation claim as a matter of law.  In this regard, even the passage of several months between an employee's protected activity and the termination of his employment is too long to establish a causal relationship based upon time alone.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.' ") (citation omitted); *Horne v. Reznick Fedder & Silverman*, 154 Fed. Appx. 361, 364 (4th Cir. 2005) (holding that "[t]he district court correctly concluded that Horne failed to produce sufficient evidence of such a causal connection" where "Horne's only evidence of causation is that she was fired two months after she accused Anderson of discrimination," because "a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation' " (quoting *King v. Rumsfeld,* 328 F.3d 145, 151 n. 5 (4th Cir. 2003)); *Westmoreland v. Prince George's County*, Md., 876 F.Supp.2d 594, 607–08 (D. Md. 2012) ("Although there is no bright-line rule on the issue of temporal proximity, the Fourth Circuit has held that a lapse of over three months between the protected activity and the alleged retaliation is too long to give rise to an inference of causality.")).

Here, Francis Schmidt's so-called protected activity occurred at the end of November 2011.  However, his employment was not terminated by Chief Robshaw until nine months later, in August 2012.  This lapse of time alone extinguishes the causation element.

23

Moreover, an ADA retaliation claim requires a causal connection between a plaintiff's protected activity and the adverse employment action. *Coleman*, 626 F.3d at 190. That causal link requires much more than "retaliatory animus" that "motivates" the contested action. Instead, a plaintiff "must establish that his or her protected activity was the *but-for* cause of the alleged adverse action by the employer," not just a "motivating factor." *Nassar*, at 2533–34. Here, the sheer volume of Charges of Discrimination, complaints, and accusations made by the Schmidts negates even the suggestion of "but for" causation. The Schmidts have linked the myriad allegedly retaliatory actions against Francis Schmidt, up to and including termination, to everything---and anything---to charges of so-called sexual harassment, supporting charges of so-called sexual harassment, application for FMLA leave, pursuing worker's compensation benefits, and generally just complaining to others verbally and in writing about the Chief of Police. As such, the circumstances that the Schmidts themselves have created render it legally impossible for them to establish the but for causation necessary for this claim to survive. And, for this reason alone, the claim fails.

Further, the record itself belies the existence of discriminatory animus behind any of the supposed acts of retaliation against Francis Schmidt. The record establishes that in the summer of 2011, the police department learned that there was significant damage to the patrol car issued to Francis Schmidt. The department also learned that no damage to the vehicle had been reported by Francis Schmidt. The internal investigation, conducted by Lieutenant Roski of the Hyattsville Police Department, resulted in several sustained administrative charges against Francis Schmidt. A Hearing Board convened under the LEOBR heard and considered the evidence. Francis Schmidt was represented by counsel throughout all of these proceedings. Based upon the evidence presented, the Hearing Board determined that Francis Schmidt had, in fact, failed to report the damage to his patrol car and that he had lied to Lieutenant Roski during his investigation.

It was the finding of untruthfulness that placed the police department in jeopardy.  That finding impacted Francis Schmidt's ability to continue his a career as a municipal police officer.  The Chief of Police consulted with the Prince George's County State's Attorney's Office and was informed that, in light of the administrative finding, that office would not go forward with any prosecution in which Officer Schmidt played a role.  This was because State law requires prosecutors to disclose to criminal defense attorneys administrative findings bearing on a police officer's truthfulness or credibility.  In addition, the finding of untruthfulness undermined not only the Chief's trust in his officer, but the department's trust and respect as a whole.  Simply stated, an officer who has been found to have lied during the course of an investigation cannot continue as an officer.  The public expects, and deserves, more.

To believe, as seemingly the Schmidts do, that this was all some kind of grand scheme that played out over the course of a year (Summer 2011 through Summer 2012) defies reason.  The Chief of Police didn't damage the patrol car and the Chief of Police didn't conduct the investigation.  The Chief also didn't instruct Francis Schmidt to be untruthful to the investigator and didn't determine what the LEOBR panel would decide.  Instead, the Chief acted in response to the events, and the finding of untruthfulness alone led to the decision embodied in the Chief's memorandum dated August 28, 2012.  (Exhibit 25).  This conclusion is borne out by examining the outcome and decision as a result of the second LEOBR proceeding.  In that case, absent any finding of untruthfulness, Chief Robshaw did not terminate Francis Schmidt's employment.  (Exhibit 32; Exhibit 33).  If he were motivated to do, so as the Schmidts allege, there was virtually nothing stopping him from doing so.

Finally, as to the other acts of "retaliation" identified by Francis Schmidt, including his emergency suspension with pay under the LEOBR on April 23, 2012 (Exhibit 6), they amount to

nothing.  As the suspension letter indicates, Francis Schmidt was suspended subsequent to the

issuance of administrative charges, on grounds that he "[k]nowingly g[ave] false statements to

supervisors or the public" and Immoral or unethical conduct reflecting unfavorably on the Town as

an employer."  (Exhibit 18).  Explaining his decision to impose the suspension, Chief Robshaw

testified,

> "based on the evidence in the investigation, that it was at least likely that
> he made a false statement.  And knowing how the State's Attorneys and
> the courts viewed those, it didn't make sense to put him in a position out
> there in patrol where he may well influence, ultimately influence, an arrest
> or something other – that he would have done in the course of his
> employment."

(Exhibit 7, Depo, p. 190, line 6 through p. 191, line 8).  This legitimate, non-retaliatory motive

disposes of this aspect of Francis Schmidt's claim.

Finally, Francis Schmidt also alleges retaliation based upon "performance counseling" he

received for an occurrence on December 8, 2012.  (Exhibit 6; Exhibit 34).  It is undisputed that no

adverse employment action flowed from this innocuous action (one non-actionable counseling over

nine months).   Thus it defies credulity to suggest otherwise, and shows the length the Schmidts will

go, and have gone, in their vendetta against the Chief of Police.

## C.      The Failure of the State Law Claim

Francis Schmidt's invocation of relief under State law is equally without merit.  Similar to

Title VII, Maryland's anti-discrimination statutes prohibit unlawful employment practices, including

retaliation.  Section 20-606(f) states as follows:

> *Opposition to unlawful employment practice; participation in enforcement
> proceeding.*---An employer may not discriminate or retaliate against any
> of its employees or applicants for employment, an employment agency
> may not discriminate against any individual, and a labor organization may
> not discriminate or retaliate against any member or applicant for
> membership because the individual has:

(1)   opposed any practice prohibited by this subtitle; or

(2)   made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle.

MD. CODE ANN., STATE GOV'T § 20-606(f)(1) and (2).  As to a retaliation claim under State law, "a *prima facie* case is dependent upon proof that the plaintiff (1) engaged in protected conduct, (2) that he or she suffered an adverse action, and (3) that a causal link exists between the protected conduct and the adverse action."  *See Testerman v. The Procter & Gamble Mfg. Co.,* No. CV CCB-13-3048, 2015 WL 5719657, at *7 (D. Md. Sept. 29, 2015).

As discussed above, Donna Schmidt's Charge of Discrimination was not, and did not involve, "an investigation, proceeding, or hearing under this subtitle."  To the contrary, her Charge of Discrimination solely implicated County, not State law.  Again, because it did not involve an "unlawful employment practice," it found no refuge in State law.  For this reason, this aspect of Francis Schmidt's EEO Reprisal claim must also fail.

In addition, Maryland's anti-discrimination laws are similar to the protections afforded by Title VII, and, as such, Maryland's anti-discrimination laws are "guided by federal cases interpreting Title VII.  *Finkle v. Howard County, Maryland,* 12 F. Supp. 3d 780, 784 (2014).  *See Insalaco v. Anne Arundel Co. Pub. Schs.* 2012 WL 253405.  As discussed above, the Complaint, as amended, does not include a cause of action based upon disability retaliation.  Even if it had, it would fail in light of the discussion above.  Simply stated, Francis Schmidt cannot establish that he engaged in protected conduct; that he suffered adverse action as a direct result thereof; or that but-for causation existed between the conduct and the employment action.  Consequently, any State law claim for disability retaliation would have failed just as the similarly not pled claim for ADA retaliation.

### D.    The Failure of the Prince George's County Code Claim

It is unquestioned that State law, specifically Subtitle 12 of § 20 of the State Government Article (Civil Actions–Violations of County Discrimination Laws), provides an alternative avenue of relief for residents of Howard, Montgomery, Prince George's, and Baltimore Counties.  *See Edgewood Management Corp. v. Jackson*, 212 Md. App. 177, 213 (2013).  Here, however, although Francis Schmidt worked in Prince George's County, at the times their respective Charges of Discrimination were filed, neither he nor his wife resided in Prince George's County.  At the time of all of the events in question, the Schmidts resided in the Commonwealth of Virginia.  (Exhibit 6; Exhibit 10).  Therefore, the protections afforded by the County Code, which are designed to protect the "lives of [Prince George's County] citizens, Prince George's County Code, Subtitle 2, Division 12, Subdivision 1, §2-185, do not apply.  Further, as is evidenced by the portions of the Prince George's County Code excerpted here, the alleged misconduct of Chief Robshaw at social gatherings was nothing encompassed by local law.[10]  The law ostensibly protects citizens from

---

[10] The Prince George's County Code provides protections to residents of Prince George's County from the conduct of Police Officers.  The Code specifically provides:

(a) The Human Relations Commission shall have the authority to investigate, and hold a formal hearing, on any sworn complaint against any law enforcement officer operating within the County, except a complaint against a member of the Prince George's County Police Department, which alleges any of the following categories of complaints that are defined and prohibited by law or regulation:

   (1)    Police harassment;

   (2)    The excessive use of force in the performance of his duties;

   (3)    The use of language which would demean the inherent dignity of any person.

harassment by police officers in the performance of their lawful police duties, and not from private conduct in social settings.

Even if Francis Schmidt could assert standing under the County Code, there are no protections applicable to him.  The County Code prevents retaliation against individuals who have "lawfully opposed any act or failure to act that is a violation of this Act or has, in good faith, filed a complaint, testified, participated, or assisted in any way in any proceeding under this Act."  Prince George's County Code, Subtitle 2, Division 12, Subdivision 1, §2-209.  At no time did Francis Schmidt "lawfully oppose any act or failure to act that is a violation of this Act or … in good faith, file a complaint, testify, participate, or assist in any way in any proceeding under this Act."  To the contrary, he participated in his wife's campaign to save his job by filing his own Charge of Discrimination two weeks after she did.

As discussed above, Donna Schmidt readily admits to her motivation.  As a non-resident of Prince George's County, and a non-employee of the Town, she had no ability to lawfully act under the County Code.  Further, she sought relief related to private conduct at social settings that had supposedly occurred years before.  As such, she sought neither to advance nor vindicate any guaranty or protection in the Code.  As to her husband, he did nothing more than allegedly "participate" in this scheme by filing his own Charge two weeks later.  The "retaliation" he charged was in bad faith because: first, it was not retaliation; second, the Chief's and Town Administrator's informing Corporal Gizinski that the Town did not have a leave donation policy occurred before the Town even knew of Donna Schmidt's Charge; and third, her Charge under the Code was made in bad faith for the reasons set forth above.  Moreover, and as a final note of interest, there is nothing

---

Prince George's County Code, Subtitle 2, Division 12, Subdivision 1, §2-229.  These protections obviously relate to the conduct of police officers acting in the scope of their employment as police officers, carrying out their police powers.

in the record establishing just how Francis Schmidt "participated" in his wife's Charge of

Discrimination.

### E.    The Failure of the Wrongful Termination Claim

#### 1.    The Existence of Governmental Immunity

Francis Schmidt's claim of wrongful discharge in Count III is barred by governmental

immunity.  As such, the merits of the claim need not be reached.  For the purposes of this Motion,

however, the Town also addresses the substantive, and fatal deficiencies of this claim.

In ordinary tort actions, local governments are immune from suit with respect to non-

constitutional torts when they exercise "governmental" rather than "proprietary" or "corporate"

functions.  *Anne Arundel County v. McCormick*, 323 Md. 688, 695 (1991).  With limited exception,

governmental immunity is available against all claims arising from the performance of a

governmental function, regardless of the particular theory.  Governmental immunity attaches to all

government acts even if a plaintiff alleges that the actions were performed with actual malice.  *See*

*Wilkerson v. Baltimore County*, 218 Md. 271, 273 (1958).  Although the Local Government Tort

Claims Act ("LGTCA") MD. CODE ANN., CTS. & JUD. PROC. §§ 5-301 – 5-304, obligates a

municipality under certain circumstances to indemnify its employees for judgments entered against

its employees, the LGTCA does not permit a cause of action directly against a municipality.

*Livesay v. Baltimore County*, 384 Md. 1, 20 (2004) (citing *Williams v. Maynard*, 359 Md. 379, 394

(2000)).

In *Williams v. Prince George's County*, 112 Md. App. 526, 553 (1996), a case arising out of

the actions of police officers, common law tort claims were brought against Prince George's County.

The Court of Special Appeals explained that "[c]ounties are shielded from tort liability for

governmental actions unless the General Assembly has specifically waived the immunity of the

municipality." *Williams*, 112 Md. App. at 553 (footnote omitted and *citing Md.–National Capital Park and Planning Comm. v. Kranz*, 308 Md. 618, 622 (1987)).  The court concluded that there had been no waiver of such immunity for Prince George's County, and that the LGTCA did not specifically waive immunity for common law tort claims against a County or municipality in its own capacity, for governmental actions.  *Williams,* at 554.

In this regard, a municipality's operation of a police department is purely governmental. "The operation by a county of its police department is quintessentially governmental."  *Clark v. Prince George's County*, 211 Md. App. 548, 558 (2013) (citing *Wynkoop v. Hagerstown*, 159 Md. 194 (1930).  The "operation" of a municipal police department by necessity includes the employment decisions made literally on a daily basis.  *See Clark*, 211 Md. App. at 558-59 (The circuit court correctly ruled that the County could not be sued in its own capacity for common law tort liability, including for the torts of negligent hiring, retention, or entrustment regarding [Officer] Washington); *Myers v. Hose,* 50 F.3d 278, 285 n3 (4th Cir. 1995)(under Maryland law a municipality is immune from damages with respect to a common law wrongful discharge claim); *Bharadwaja v. O'Malley,* Case No. RDB 04-3826, 2004 WL 5391879, at *15 n19 (D. Md. Dec. 3, 2004) (citing *Lizzi v. Alexander,* 255 F.3d 128, 133 (4th Cir. 2001) ("[H]iring, training, and supervision practices are governmental functions."), overruled in part on other grounds by *Nevada Dep't. of Human Resources v. Hibbs,* 538 U.S. 721 (2003)).

The decision in *Hoffman v. Baltimore Police Dep't*, 379 F. Supp. 2d 778, 790 (D. Md. 2005) is extremely pertinent here.  A former attorney employed by the Baltimore City Police Department sued, alleging discrimination, and eventual termination, on the basis of race (Caucasian).  In his Complaint, Plaintiff alleged federal and state law claims, including a state law claim of wrongful discharge.  The Defendants moved to dismiss all of the claims against them.  As to wrongful

discharge, Plaintiff alleged that public policy---namely the public policy embodied in the Maryland

Public Information Act, MD. CODE ANN., STATE GOV'T § 10-614 *et seq.* ("the MPIA")---was

violated in his termination.  He essentially alleged that he was immediately terminated subsequent to

his invocation of his right to public records under the MPIA.  In ruling on the motion to dismiss, the

Court agreed with Plaintiff that the MPIA embodied a mandate of public policy (the general

presumption in favor of disclosure of government or public documents), and that the alleged

violation of this policy through termination of Plaintiff's employment would otherwise be

unvindicated.

The question then turned to the issue of governmental immunity asserted by the City of

Baltimore.  The Court found that because the City Police Department's decision to terminate arose

from the exercise of a governmental function, namely the operation of a municipal police

department, the City itself was governmentally immune from liability.  The Court said:  "Defendants

argue, and Plaintiff does not dispute, that the City has governmental immunity from direct tort

liability arising from the exercise of governmental functions, such as personnel decisions.  The

wrongful discharge claim against the City will be dismissed."  *Hoffman,* 379 F. Supp. 2d at 790

(citations omitted).

Similarly, the wrongful discharge claim against the Town cannot survive the assertion of

governmental immunity.  Certainly, a claim of wrongful discharge claim is stated where, as here, it

is alleged that an employee was terminated for filing a worker's compensation claim.  *See Allen v.*

*Bethlehem Steel Corp*., 76 Md. App. 642 (1988).  However, where the defendant is a local

government, such claim cannot survive such defendant's assertion of governmental immunity.  And,

in the absence of suit against any Town official, including Chief Robshaw, Count III must fail.

### 2.    The Absence of Legal Causation

In its Order dated September 25, 2014, the Court expressly limited Francis Schmidt's

Wrongful Discharge claim to the alleged violation of the Worker's Compensation Act.  In other

words, Francis Schmidt must establish that his termination was solely the result of his making a

claim for worker's compensation.  That claim is further undermined by his wife's sworn assertion in

her Charge of Discrimination that the Police Chief had "threatened to terminate" Francis Schmidt's

"employment as recent as November 2011" if Donna Schmidt made a complaint against him.

(Exhibit 10).  She made such complaint on November 15, 2011.  Further, based upon the Schmidts'

version of the events, Chief Robshaw told the department's Fraternal Order of Police (F.O.P)

representative of his intention to terminate Francis Schmidt.  Specifically, they claim that Chief

Robshaw told Corporal Edmund Gizinski of his intention to terminate Francis Schmidt.  According

to Corporal Gizinski, Chief Robshaw said, "As FOP Representative I am going to give you a head

[sic] up"  "Frank filed a worker's comp claim.  Frank is out of leave, so me and the Town

Administrator are going to terminate Frank."[11]  (Exhibit 35, p. 3, ¶ 15).

This assertion on its face is, from a common sense standpoint, quite unbelievable.  The

department's F.O.P. representative would have been the last person Chief Robshaw would have

spoken to about terminating Francis Schmidt's employment.  Plausibility aside, even the Schmidt's

"evidence" does not support the claim.  Their evidence does not establish that because Francis

Schmidt pursued worker's compensation, he was going to be terminated.  To the contrary, the reason

---

[11] In their Affidavits, both Donna and Francis Schmidt conveniently omit any mention of the fact that Chief Robshaw told Corporal Gizinski that Francis Schmidt "was out of leave."  That fact is set forth in Corporal Gizinski's Affidavit.  According to their Affidavits, however, Corporal Gizinski told them only that Chief Robshaw had said: "I'm giving you a heads up since you're the FOP representative; Frank is trying to file Worker's Comp, so we're going to fire him."  (Exhibit 13, ¶ 12; Exhibit 36, ¶ 20).  This is just another example of the Schmidts inability to speak the truth and their willingness to twist the evidence to their needs.

allegedly given for the imminent termination was that "Frank is out of leave."  The fact that, at that time, Francis Schmidt had exhausted all of his leave pursuant to the Town's personnel policy is not genuinely in dispute.  (Exhibit 2; Exhibit 3).  Threatening termination for leave exhaustion is a far cry from doing so for filing a worker's compensation claim.

As to the legal framework in which to view these facts, the tort of wrongful or abusive discharge in Maryland "is defined as the willful termination of employment by the employer because of the employee's alleged failure to perform in accordance with the employer's expectations and the termination is contrary to a clear mandate of public policy."  *Allen v. Bethlehem Steel Corp*., 76 Md. App. 642, 652 (1988).  To establish a claim for wrongful discharge, an employee "must be discharged, the basis for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee."  *Wholey v. Sears Roebuck,* 370 Md. 38, 50-51 (2002).  The Court of Appeals has recognized that Maryland has a clear mandate of public policy that an individual cannot be terminated *solely* because he filed a workers' compensation claim.  *Ewing v. Koppers Co. Inc.,* 312 Md. 45, 50 (1988) ("Discharging an employee solely because that employee filed a worker's compensation claim contravenes the clear mandate of Maryland public policy.").

Here, Donna Schmidt's own testimony establishes another reason for her husband's termination: her filing a Charge of Discrimination against Chief Robshaw.  Apart from that, however, there is an entire body of undisputed evidence that the termination of Francis Schmidt's employment, which occurred in August 2012, *nearly a year after* he filed for worker's compensation benefits.  In addition to a lack of temporal proximity, that body of evidence establishes not only the lack of temporal proximity, but that his effort to conflate the disciplinary proceedings against him with Workers' Compensation issues was doomed to fail then as it is now.  Moreover, the disciplinary

action taken against Francis Schmidt was not imposed until after not one, but two Hearing Boards determined that he failed to report mechanical problems with his departmentally issued patrol car. The motivation for termination was articulated and supported by Chief Robshaw in August 2012. That decision to discharge contravened no mandate of established Maryland public policy.

### C.        The Failure of Loss of Consortium Claim

The absence of physical injury renders the Schmidts' Loss of Consortium claim baseless.  In Maryland, a claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party.  *Deems v. Western Maryland Ry. Co.*, 247 Md. 95, 100 (1967*). See also Klein v. Sears Roebuck*, 92 Md. App. 477, 493 *cert. denied*, 328 Md. 447 (1992) (setting forth the possible injuries that a married person may sustain as a result of a third party's tortious conduct, which include "(1) the physical injury to the spouse who was directly injured by the tortious conduct and (2) the derivative loss of society, affection, assistance, and conjugal fellowship to his or her spouse").  Loss of consortium is not a separate cause of action; it is rather a compensable injury that must be filed jointly by a couple and tried concurrently with the claim of the physically injured spouse in order to avoid duplication of awards.  *Deems,* 247 Md. at 109–11. *See also Phipps v. General Motors Corp.*, 278 Md. 337, 354–56 (1976); *Travelers Indem. Co. v. Cornelsen*, 272 Md. 48, 50 (1974) (stating that our decision in *Deems* "created a new substantive right ... [and] delineated a different procedural approach in actions for loss of consortium. Nevertheless, it gave rise to no new cause of action").

The sham that is the Schmidt's Loss of Consortium claim is exposed by the absence of any "physical injury" caused by the Town.  Without it, the claim fails as a matter of law.  But there is even more in the record to expose this claim.  In her Answers to Interrogatories, Donna Schmidt

"solemnly affirmed" that the Schmidts' "damages" as married persons began on a specific date, August 30, 2010, and continued thereafter.  (Exhibit 37, Answer to Interrogatory No. 21).  This date pre-dated the supposed "EEO Reprisal" by roughly a year, and predated the "Wrongful Discharge" of Francis Schmidt by two years.  As to the specifics of what transpired in August 2010, Donna Schmidt testified as follows:

> "Since August 30, 2010, upon being notified of Chief Robshaw's sexual assault and sexually harassing actions towards me, Frank Schmidt's mental, emotional and physically (sic) well-being has been affected.  He has not been able to perform 'intimate marital relations', his mental capacity to be a 'dad' has spiraled downward, and his physical being has been affected to where he is so drained that he cannot cooperate in family functions.  His personality has turned from gentle and loving to cold and at times, mean.  The fact that he is being retaliated against and it has caused harm to our family has had a major impact on his mental status."

(Exhibit 36, Answer to Interrogatory No. 5).  So, Donna Schmidt "notified" her husband on their wedding anniversary, in August 2010 of conduct involving Chief of Robshaw that supposedly occurred in December 2008.  To reaffirm, Donna Schmidt again "solemnly affirmed" in answer to No. 20, that "Francis Schmidt has not been able to perform in marital life since August 30, 2010."   (Exhibit 36, Answer to Interrogatory No. 36).  Thus, according to Donna Schmidt's affirmed version of events, the Schmidt's marital difficulties were caused solely, and have continued to be caused solely, by her revelations to her husband in August 2010, and not to any alleged reprisal or termination of employment.

As to Francis Schmidt, it gets no better.  First, in his answer to Interrogatory No. 7, Francis Schmidt gets the date of the supposed conversation with Donna Schmidt wrong. (Exhibit 1, Answer to Interrogatory No. 7).  He then affirmed that since the date of his conversation, he has not had sexual relations with his wife.  (Exhibit 1, Answer to Interrogatory No. 7).  Again, not attributable to any supposed act or reprisal or termination, but to a

conversation that preceded both.  Finally, Francis Schmidt affirmed that due to his "wrongful discharge," he "cannot provide emotional or financial support to his wife and family."  (Exhibit 1, Answer to Interrogatory No. 7).  So, in this second part of his answer, Francis Schmidt pinned at least a portion of the claimed loss of consortium to his cause of action for wrongful discharge.  That count, however, cannot survive the assertion of governmental immunity, and, as it fails, so does the claimed loss of consortium resulting from it.

## V.    Conclusion

For these reasons, Defendant's Motion for Summary Judgment must and should be granted.


_____/s/_____
John F. Breads, Jr.
Federal Bar No. 01343
jbreads@lgit.org


_____/s/_____
Matthew D. Peter
Federal Bar No. 26351
mpeter@lgit.org
7225 Parkway Drive
Hanover, Maryland  21076
(443) 561-1700

Counsel for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 16th day of October 2015, a copy of the foregoing

Memorandum in Support of Defendants' Motion for Summary Judgment was filed electronically

with notice to counsel of record.


_____/s/_____
John F. Breads, Jr.